J-S27010-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| CASEY RILEY FOWLER | : | |
| | : | |
| Appellant | : | No. 2038 EDA 2023 |

Appeal from the Judgment of Sentence Entered March 31, 2023
In the Court of Common Pleas of Chester County Criminal Division at
No(s): CP-15-CR-0001378-2021

BEFORE: LAZARUS, P.J., NICHOLS, J., and STEVENS, P.J.E.*

MEMORANDUM BY LAZARUS, P.J.:        **FILED JANUARY 09, 2025**

Casey Riley Fowler appeals from the judgment of sentence, imposed in the Court of Common Pleas of Chester County, after a jury convicted him of five counts of rape of a child,[1] two counts of unlawful contact with a minor,[2] and one count each of aggravated indecent assault of a child,[3] endangering the welfare of children,[4] corruption of minors,[5] and terroristic threats.[6] After

_____

[1] 18 Pa.C.S.A. § 3121(c).

[2] *Id.* at § 6318(a)(1).

[3] *Id.* at § 3125(b).

[4] *Id.* at § 4304(a)(1).

[5] *Id.* at § 6301(a)(1)(ii).

[6] *Id.* at § 2706(a)(1).

*Former Justice Specially Assigned to the Superior Court.

careful review, we vacate Fowler's convictions for unlawful contact with a minor and otherwise affirm the judgment of sentence.

This case arises from a years-long pattern of sexual abuse perpetrated by Fowler against his half-sister, C.F. ("Victim"), who was between three and eleven years-of-age at the time of the abuse. Fowler was born on June 29, 1993, and Victim was born in September 2002. *See* N.T. Trial, 12/6/22, at 41-42. During the relevant time period, between approximately 2005 and 2013, the Victim resided with her mother, Kathy Donnon[7] ("Mother"), her Father, Joey Glenn Fowler ("Father"), and her half-brothers, Fowler and J.F.

Over the years relevant to this matter, the family lived at three different addresses. Between December 2005 and April 2011, the family lived at 108 Gable Road. *Id.* at 30. The family then moved to a rental property on Hibernia Road, where they lived for 1-1½ years. *Id.* at 35. Thereafter, the family moved to a mobile home on Tulip Road. *Id.* at 38. Fowler lived with the family on Tulip Road for a period of time before moving to Georgia. *Id.* at 67, 91. In approximately 2013, while living on Tulip Road, Victim's parents separated and Victim went to live with Mother. *Id.* at 38, 67.

Victim testified that the family moved to Gable Road when she was two or three years old. *Id.* at 88. They then moved to Hibernia Road when she was in third grade, making her 8 or 9 years old at the time. *Id.* at 89. The

_____

[7] When being sworn in, Mother gave her name as "Kathy D'Angelo Fowler." However, she subsequently stated that she had recently reverted to her maiden surname, Donnon. Accordingly, we refer to her as such.

family lived there for one year. *Id.* at 90. Prior to Victim beginning fourth grade, the family moved to Tulip Road. *Id.* Victim testified that her relationship with Fowler "seemed fine as a child," *id.* at 93, but then "got a little different as I got up to about five years of age." *Id.* Specifically, Victim testified that her relationship with Fowler "became a physical . . . not appropriate relationship that you would normally have with a sibling." *Id.* at 94. Victim testified that one day, just before her fifth birthday, while the family was living on Gable Road,[8] she was hiding behind a tree and Fowler "came up behind [her] . . . and [] put his hand in [her] pants." *Id.* at 94, 97.

Victim testified that the next incident, which also occurred on Gable Road, took place while Fowler was babysitting for Victim and her brother. *Id.* at 97. Victim testified they were cooking dinner in the kitchen and she "didn't want to listen" to Fowler. *Id.* Fowler got upset and kicked a stool at her leg. *Id.* When Victim went to get the phone to call their parents, Fowler pushed her on the floor, got on top of her, pulled her shorts and underwear off, and put his penis in her vagina. *Id.* While doing so, Fowler told her that "if [she] were to tell anyone[,] he would kill [her]." *Id.* at 98. Victim testified that the assault was "painful" and lasted for approximately five to seven minutes. *Id.* Victim stated that Fowler inserted his penis into her vagina "at least one other time" while the family was living on Gable Road. *Id.* at 100. Victim testified

---

[8] Victim testified that she knew the incident occurred right before her fifth birthday "[b]ecause of when we got my dog. . . . [W]e got the dog in July and my birthday [is] in September." *Id.* at 95.

that Fowler "had gotten upset, again, about me not behaving when he was in charge of us, babysitting. I had fallen down the stairs and then when I was at the bottom of the stairs is when it occurred." *Id.* Victim also testified that, while living on Gable Road, Fowler "chucked [a basketball] at [her] face and it hit [her] in [her] nose," causing it to bleed. *Id.* at 105.

After the family moved to Hibernia Road, Victim testified that she recalled two additional instances in which Fowler put his penis in her vagina. *Id.* at 102. On both of those occasions, Fowler was babysitting for Victim and Joey and Victim did not listen to his instructions. *Id.* (Victim testifying Fowler wanted her to come inside from pool to eat lunch and she did not listen; he then got on top of her and inserted his penis into her vagina); *Id.* at 104 (Victim testifying when she was in her room and did not listen to Fowler, he came into her room, took off her pants and underwear, and put his penis in her vagina). Victim testified that Fowler also showed her his penis when he was getting out of the shower on Hibernia Road. *Id.* at 103.

Victim testified to a final incident that occurred after the family moved to Tulip Road.

> I think [I was in] the fifth grade and I went to one of those winter social group get-together type things and I came back and my dad was upset with me that I didn't call to let him know when to pick me up. So[,] he was waiting for me outside for too long. And he was telling [Fowler] about it. And for some reason, it got [Fowler] upset, as well. And when my dad had [gone] to an AA meeting at the time, [Fowler] came into my room and . . . he had his penis in my vagina.

*Id.* at 107.

On December 8, 2022, a jury convicted Fowler of the above-mentioned offenses.[9]  That same day, the trial court ordered a pre-sentence investigation report.  On December 9, 2022, the court issued an order directing that the Sexual Offender Assessment Board perform an assessment of Fowler, pursuant to 42 Pa.C.S.A. § 9799.24, to determine whether he met the criteria to be classified as a sexually violent predator ("SVP").

On March 31, 2023, the court sentenced Fowler to an aggregate term of 20 to 40 years' incarceration.  Fowler's sentence included mandatory minimum sentences of 10 years for each count of rape of a child.  *See* 18 Pa.C.S.A. § 9718(a)(3).  At the time of sentencing, defense counsel agreed that the SVP hearing would be deferred to a later date.  *See* N.T. Sentencing, 3/31/23, at 2-3.  On April 11, 2023, eleven days after he was sentenced, Fowler filed post-sentence motions for judgment of acquittal and a new trial and a motion to modify his sentence.  *See* Post-Sentence Motion, 4/11/23. Fowler filed an amended motion for modification of sentence on May 24, 2023. On May 30, 2023, the trial court held hearings on Fowler's post-sentence motions as well as to determine if he was an SVP.  On June 27, 2023, the trial court denied Fowler's post-sentence motions and, on June 30, 2023, the court issued an order determining that Fowler met the criteria to be classified as an SVP.  Fowler filed a timely notice of appeal on July 27, 2023.  *See*

_____

[9] Fowler was acquitted of two counts each of indecent assault of a child, *see* 18 Pa.C.S.A. § 3126(a)(7), and simple assault.  *See* 18 Pa.C.S.A. § 2701(a)(1).

- 5 -

*Commonwealth v. Schrader*, 141 A.3d 558, 561 n.1 (Pa. Super. 2016) (where defendant waives pre-sentence SVP determination, judgment of sentence not final for purposes of appeal until SVP determination made). Both Fowler and the trial court have complied with Pa.R.A.P. 1925. Fowler raises the following claims for our review:

> I. Did the sentences imposed on two counts of rape of child [] and the sentence imposed on the terroristic threats conviction [(collectively, Gable Road offenses)] violate the *ex post facto* provision of Article I § 10 clause 1 of the United States Constitution and Article 1 § 17 of the Pennsylvania Constitution? Was the punishment imposed by th[e trial] court greater than that which could have been imposed on [Fowler] when the offenses were committed?
>
> II. Did the sentences imposed on [the Gable Road offenses] violate the equal protection and due process clauses as guaranteed by the Fourteenth Amendment to the United States Constitution and Article 1 §§ 1, 9, and 26 of the Pennsylvania Constitution?
>
> III. Did the sentences imposed on [the Gable Road offenses] violate the prohibition against cruel and unusual punishment as guaranteed by the Eighth Amendment to the United States Constitution and Article 1 § 13 of the Pennsylvania Constitution?
>
> IV. Was insufficient evidence presented to support the element of "contact" to support the two unlawful contact [with a] minor[] convictions?
>
> V. Did the trial court err in that it did not consider [Fowler's] age, lack of maturity, [the] abuse [Fowler] endured, or the potential[] that[,] with proper treatment, [Fowler] could be successfully rehabilitated? Did the trial court err in not considering [Fowler's] background or his rehabilitative needs, as required by 42 Pa.C.S.A. § 9721(b)?

Brief of Appellant, at 5 (unnecessary capitalization omitted).

Fowler's first three claims raise constitutional challenges to the

sentences imposed on the Gable Road offenses.  First, Fowler asserts that the sentences violate the *ex post facto* provision of Article I § 10 clause 1 of the United States Constitution and Article 1 § 17 of the Pennsylvania Constitution, as the punishment imposed by the trial court was greater than that which could have been imposed on Fowler at the time the offenses were committed.  Fowler argues that, because he was a minor when he committed these offenses, he would not have "anticipate[d] being sentenced as an adult . . . [or] being subject to an adult mandatory minimum sentence of ten to twenty years."  Brief of Appellant, at 21-22.  Fowler notes the distinctions between children and adults frequently cited by the courts, including those of this Commonwealth, and concludes that "[l]ogically, the consequence imposed on a child for committing the same action as an adult would take into account the child's diminished capacity due to their immaturity, impulsivity, and lack of comprehending the seriousness of their actions."  *Id.* at 21.  Because the court imposed "greater punishment than the law would have permitted for a juvenile convicted of the same offenses," Fowler argues the sentence violates the *ex post facto* clauses of the U.S. and Pennsylvania Constitutions.  *Id.* at 23.  Fowler is entitled to no relief.

"The *ex post facto* prohibition forbids the Congress and the States to enact any law which imposes a punishment for an act which was not punishable at the time it was committed[,] or imposes additional punishment to that then prescribed."  *Commonwealth v. Rose*, 127 A.3d 794, 798 (Pa. 2015) (citations and internal quotation marks omitted).  The *ex post facto*

clauses of both the Pennsylvania and U.S. constitutions "are virtually identical and the standards applied to determine an *ex post facto* violation under the Pennsylvania Constitution and the United States Constitution are comparable." *Commonwealth v. Young*, 637 A.2d 1313, 1317 (Pa. 1993).

In 1798, the United States Supreme Court defined an *ex post facto* law as:

> 1st.  Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action.  2d.  Every law that aggravates a crime, or makes it greater than it was, when committed.  3d.  Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed.  4th.  Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offense, in order to convict the offender.

*Calder v. Bull*, 3 U.S. 386, 390 (1798).  "Critical to relief under the [*e*]x [*p*]ost [*f*]acto [c]lause is not an individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated." *Weaver v. Graham*, 450 U.S. 24, 30 (1981).  "[T]wo critical elements must be present for a criminal or penal law to be *ex post facto*:  [(1)] it must be retrospective, that is, it must apply to events occurring before its enactment, and [(2)] it must disadvantage the offender affected by it." *Id.* at 92 (citation omitted).

Recently, in **Commonwealth v. Armolt**, 294 A.3d 364 (Pa. 2023), the Pennsylvania Supreme Court granted allowance of appeal to determine whether the criminal court possessed jurisdiction to convict and sentence an

adult for sex crimes committed as a juvenile. The Court noted the limited jurisdiction conveyed to the juvenile courts through the Juvenile Act, "the scope of which applies '**exclusively** to . . . [p]roceedings in which a child is alleged to be delinquent or dependent.'" **Id.** at 372, quoting 42 Pa.C.S.A. § 6303(a)(1) (emphasis added in **Armolt**). The Court further noted that the Act explicitly defines a "child" as an individual who "is under the age of 18 years" or "is under the age of 21 years who committed an act of delinquency before reaching the age of 18 years." **Armolt**, 294 A.3d at 372, quoting 42 Pa.C.S.A § 6302. The Court reasoned:

> Were we to adopt appellant's position that the adult criminal court lacked jurisdiction over him because he committed his crimes before the age of eighteen, it would mean that no court would have jurisdiction to try and sentence him. **See In re Jones**, [] 246 A.2d 356, 363 n.5 ([Pa.] 1968) ("The Juvenile Court . . . loses jurisdiction over persons when they attain majority."). As a practical result, then, all juvenile offenders who escape prosecution until after they turn twenty-one could not be held accountable in any state court in this Commonwealth. This would effectively relieve juvenile offenders of all consequences of their criminal acts if not prosecuted before the age of twenty-one. We do not believe the General Assembly intended such a sweeping and drastic result.

**Armolt**, 294 A.3d 372-73.

Although the defendant in **Armolt** raised constitutional challenges identical to those Fowler raises in the matter *sub judice*, the Majority found them waived for various reasons. However, concluding that those constitutional claims sounded in legality and were, thus, non-waivable, Justice Wecht addressed them as follows in his concurrence:

- 9 -

> In my view, no constitutional-based legality-of-sentence claim can succeed here because, as the Majority correctly holds, Armolt could claim no right (constitutional, statutory, or otherwise) to a juvenile disposition of his charges. Consequently, Armolt is entitled to no comparison between the way his case proceeded and how it would have proceeded in juvenile court. Because that comparison is at the heart of each of his legality claims, each must fail. That means that Armolt cannot reasonably claim that he suffered an increase in his sentence—a purported *ex post facto* violation—when he was never entitled to, and did not receive, an initial adjudication in juvenile court. Nor can Armolt establish that his sentence constituted an equal protection or due process violation; the law does not demand that he be tried as a juvenile in the first instance. He was sentenced exactly as anyone else convicted in adult court would have been sentenced. And, finally, for Eighth Amendment purposes, inasmuch as Armolt had no right to a juvenile disposition, there was nothing unduly harsh in his four-to-eight year sentence for a seven-year course of sexual abuse, particularly when the trial court fashioned the sentence, in part, to account for the fact that Armolt was a juvenile at the time that he perpetrated the abuse.

*Commonwealth v. Armolt*, 294 A.3d 364, 393 (Pa. 2023) (Justice Wecht, concurring).

Here, as in *Armolt*, Fowler was an adult over the age of 21 when he was arrested and tried for the Gable Road offenses. As such, he was never entitled to an adjudication in juvenile court, the jurisdiction of which is limited to "[p]roceedings in which a child is alleged to be delinquent or dependent." 42 Pa.C.S.A. § 6303(a)(1). *See* 42 Pa.C.S.A § 6302 (defining "child" for purposes of Juvenile Act as individual who "is under the age of 18 years" or "is under the age of 21 years who committed an act of delinquency before reaching the age of 18 years"). The statutes under which he was sentenced were not retrospective, and, further, cannot be said to disadvantage Fowler, as he finds himself in the same position as any other offender tried, convicted,

- 10 -

and sentenced in the criminal court for the same offenses. Finally, we note that the Commonwealth acknowledged the fact that Fowler was a minor when he committed the Gable Road offenses and suggested that it "[did] not believe that it makes sense to punish him as an adult" for something he did as a juvenile. N.T. Sentencing, 3/31/23, at 19. The court evidently agreed and imposed its sentences on those counts to run concurrently to his other sentences for rape of a child.

Next, Fowler claims that his sentences for the Gable Road offenses violate his equal protection rights[10] under the Fourteenth Amendment to the U.S. Constitution and Article 1 §§ 1, 9, and 26 of the Pennsylvania Constitution. Specifically, Fowler challenges the mandatory minimum 10-year sentence for a conviction for rape of a child as it applies to him, *see* 42 Pa.C.S.A. § 9718(a)(3) (person convicted of rape of child shall be sentenced to not less than 10 years' imprisonment), as well as the "sentencing guideline range" for terroristic threats. Brief of Appellant, at 14, citing 18 Pa.C.S.A. § 1104 (fixing sentence for first-degree misdemeanor at not more than five years' incarceration). Fowler argues that the statutes apply to adult criminal defendants and their application to him "ignores the fact that the offense[s] w[ere] committed by a child," who "'lack[s] maturity and [has] an

_____

[10] In his statement of questions involved, Fowler also raises a due process challenge. However, his argument is limited to an equal protection claim. Accordingly, we deem his due process claim abandoned and, thus, waived. **Commonwealth v. Heggins**, 809 A.2d 908, 912 n.2 (Pa. Super. 2002) (issue identified on appeal but not developed in brief abandoned and, therefore, waived).

- 11 -

underdeveloped sense of responsibility[,]' leading to recklessness, impulsivity, and heedless risk-taking." Brief of Appellant, at 29, quoting **Roper v. Simmons**, 543 U.S. 551, 569 (2005). He asserts that the classification adopted in the legislation is "that the offender . . . is an adult at the time of conviction." Brief of Appellant, at 28. Fowler asserts that "adult sentencing statutes . . . do not accomplish the state interest in the instance where an offense was committed by a child who is capable of reform and should not be automatically warehoused." **Id.** Fowler argues that the application of these adult sentencing statutes to him denies him equal protection where he "is being regarded and considered as an adult for offenses committed as a child[,] while others are appropriately regarded as children by the court." Brief of Appellant, at 29. We disagree.

The Fourteenth Amendment to the U.S. Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Similarly, Article 1, Section 26 of the Pennsylvania Constitution provides that "[n]either the Commonwealth nor any political subdivision thereof shall deny to any person the enjoyment of any civil right, nor discriminate against any person in the exercise of any civil right." Pa. Const. art. 1, § 26. Our Supreme Court has held that "the equal protection provisions of the Pennsylvania Constitution are analyzed . . . under the same standards used by the United States Supreme Court when reviewing equal protection claims under the Fourteenth Amendment to the United States

Constitution." ***Commonwealth v. Albert***, 758 A.2d 1149, 1151 (Pa. 2000) (citation omitted).

In ***Curtis v. Kline***, 666 A.2d 265 (Pa. 1995), our Supreme Court set forth an extensive analysis regarding the concept of equal protection, its applicability, and the appropriate levels of scrutiny when examining a particular legislative enactment. The Court stated:

> The essence of the constitutional principle of equal protection under the law is that like persons in like circumstances will be treated similarly. However, it does not require that all persons under all circumstances enjoy identical protection under the law. The right to equal protection under the law does not absolutely prohibit the Commonwealth from classifying individuals for the purpose of receiving different treatment[ ]and does not require equal treatment of people having different needs. The prohibition against treating people differently under the law does not preclude the Commonwealth from resorting to legislative classifications, [] provided that those classifications are reasonable rather than arbitrary and bear a reasonable relationship to the object of the legislation. In other words, a classification must rest upon some ground of difference which justifies the classification and have a fair and substantial relationship to the object of the legislation. Judicial review must determine whether any classification is founded on a real and genuine distinction rather than an artificial one. A classification, though discriminatory, is not arbitrary or in violation of the equal protection clause if any state of facts reasonably can be conceived to sustain that classification. [] If the court determines that the classifications are genuine, it cannot declare the classification void even if it might question the soundness or wisdom of the distinction.

> We are also mindful of the different types of classifications and the standards according to which they are weighed:

> The types of classifications are: (1) classifications which implicate a "suspect" class or a fundamental right; (2) classifications implicating an "important" though not fundamental right or a "sensitive" classification; and (3) classifications which involve none of these. Should the statutory classification in question fall

- 13 -

into the first category, the statute is strictly construed in light of a "compelling" governmental purpose; if the classification falls into the second category, a heightened standard of scrutiny is applied to an "important" governmental purpose; and if the statutory scheme falls into the third category, the statute is upheld if there is any rational basis for the classification.

*Id.* at 267–8. Where, as here, the questioned legislation involves a purported classification based on age, the rational basis test applies. *Albert*, 758 A.2d at 1152.

In applying the rational basis test, we have adopted a two-step analysis. First, we must determine whether the challenged statute seeks to promote any legitimate state interest or public value. If so, we must next determine whether the classification adopted in the legislation is reasonably related to accomplishing that articulated state interest or interests.

*Id.* (citation omitted). In undertaking its analysis, the reviewing court is free to hypothesize reasons the legislature might have had for the classification.

*Id.*

Here, Fowler's equal protection claim is meritless where he cannot demonstrate that there is unequal treatment of similarly-situated defendants. The statutes in question apply equally to all defendants who have aged out of the juvenile system and are prosecuted for their offenses as adults in the criminal courts. In light of the Juvenile Act's definition of a child, "it is clear that the relevant determination is not limited to the offender's age at the date the crime is committed; jurisdiction also is determined by the actor's age when the proceedings commence." *Commonwealth v. Monaco*, 869 A.2d 1026, 1031 (Pa. Super. 2005) (rejecting equal protection argument proffered by defendant tried as adult for crimes committed as juvenile); 42 Pa.C.S.A. §

- 14 -

6302(2) (child is individual under age twenty-one who committed delinquent act before reaching age of eighteen). Accordingly, Fowler is entitled to no relief.

Finally, Fowler asserts that the sentences imposed for the Gable Road offenses violate the prohibition against cruel and unusual punishment as guaranteed by the Eighth Amendment to the U.S. Constitution and Article 1, § 13 of the Pennsylvania Constitution. Similar to his other constitutional claims, Fowler asserts that the diminished culpability and greater prospects for reform attributable to juveniles render them less deserving of the most severe sentences. As he was a juvenile when he committed the Gable Road offenses, Fowler argues that the policy goals sought to be achieved by the imposition of non-discretionary prison terms—i.e. reduction in sentencing disparities, deterrence, punishment, and incapacitation—are not met when applied to a person who committed his crime as a juvenile. *See* Brief of Appellant, at 34. He is entitled to no relief.

The Eighth Amendment to the United States Constitution states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted." U.S. Const. amend. VIII. "[T]he Eighth Amendment's protection against excessive or cruel and unusual punishment flows from the basic 'precept of justice that punishment for [a] crime should be graduated and proportioned to [the] offense.'" *Kennedy v. Louisiana*, 554 U.S. 407, 419 (2008), quoting *Weems v. United States*, 217 U.S. 349, 367 (1910). "[T]he guarantee against cruel punishment contained in the

Pennsylvania Constitution, Article 1, Section 13, provides no broader protections against cruel and unusual punishment than those extended under the Eighth Amendment to the United States Constitution." ***Commonwealth v. Lankford***, 164 A.3d 1250, 1252 (Pa. Super. 2017) (citation omitted). "The Eighth Amendment does not require strict proportionality between the crime committed and the sentence imposed; rather, it forbids only extreme sentences that are grossly disproportionate to the crime." ***Id.***

In ***Solem v. Helm***, 463 U.S. 277 (1983), the United States Supreme Court established a three-prong test for Eighth Amendment proportionality review. The test requires a reviewing court to be "guided by objective criteria, including (i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions." ***Id.*** at 292. "A reviewing court is not obligated to reach the second and third prongs of the test unless a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality." ***Commonwealth v. Baker***, 78 A.3d 1044, 1047 (Pa. 2013) (citation and quotation marks omitted).

Here, Fowler fails to satisfy the threshold inquiry requiring a finding of "gross disproportionality" between the crime committed and the sentence imposed. ***Id.*** Indeed, Fowler concedes that "the gravity of [r]ape of a [c]hild is surpassed by only a few violent offenses." Brief of Appellant, at 34. The

decision by the legislature to impose a mandatory minimum[11] term of 10 years' incarceration for the offense reflects its agreement with that assessment. In light of the heinous nature of the offense of rape of a child, we are unable to conclude that the mandatory minimum sentence at issue here constitutes the type of "extreme sentence" forbidden by the Eighth Amendment and Article 1, Section 13 of the Pennsylvania Constitution. *Commonwealth v. Torres*, 303 A.3d 1058, 1063 (Pa. Super. 2023) (holding section 9718(a)(3)'s mandatory minimum sentence does not violate federal and state prohibitions on cruel and unusual punishment as applied to defendant who committed rape of child as juvenile).

Fowler next claims that the evidence was insufficient to support his conviction of two counts of unlawful contact with a minor, where "contact or communication for the purpose of sexual intercourse, as envisioned by the statute and interpreted by the courts, did not occur." Brief of Appellant, at 39. Specifically, Fowler argues that there was

> no verbal communication in furtherance of sexual contact. There was no electronic communication. There was no verbal direction by [Fowler] to [Victim] to do anything as described in *Commonwealth v. Leatherby*[, 116 A.3d 73 (Pa. Super. 2015)]. Also, there were no words describing what [Fowler] was going to do or questions about how it felt[,] as described in *Commonwealth v. Davis*[, 225 A.3d 582 (Pa. Super. 2019)]. Further, there was no non-verbal physical positioning to achieve the sexual encounter[,] as described in *Commonwealth v. Velez*[, 51 A.3d 260 (Pa. Super. 2012)].

---

[11] The constitutionality of the 10-year mandatory minimum sentence under section 9718(a)(3) has been upheld by our Supreme Court. *See Commonwealth v. Resto*, 179 A.3d 18 (Pa. 2018).

***Id.*** at 39-40. In sum, Fowler argues that the Commonwealth presented no evidence that he communicated with, groomed, or contacted the victim specifically in furtherance of sexual activity. ***Id.*** at 40. We agree.

Our standard of review of a challenge to the sufficiency of the evidence is well-established:

> [O]ur applicable standard of review is "whether the evidence admitted at trial, and all reasonable inferences drawn from that evidence, when viewed in the light most favorable to the Commonwealth as verdict[-]winner, was sufficient to enable the fact[-]finder to conclude that the Commonwealth established all of the elements of the offense beyond a reasonable doubt." ***Commonwealth v. Eichinger***, [] 915 A.2d 1122, 1130 (Pa. 2007). Additionally, when examining sufficiency issues, "we bear in mind that: the Commonwealth's burden may be sustained by means of wholly circumstantial evidence; the entire trial record is evaluated and all evidence received against the defendant considered; and the trier of fact is free to believe all, part, or none of the evidence when evaluating witness credibility." ***Commonwealth v. Markman***, [] 916 A.2d 586, 598 (Pa. 2007).

***Commonwealth v. Dewald***, 317 A.3d 1020, 1038 (Pa. Super. 2024) (citation omitted).

As relevant here, "a person commits an offense if the person is intentionally in contact with a minor . . . for the purpose of engaging in an activity prohibited under" any of the offenses enumerated in Chapter 31, relating to sexual offenses. ***See*** 18 Pa.C.S.A. § 6318(a). We have previously explained the offense of unlawful contact as follows:

> Even though the statute is titled "unlawful contact with a minor," it is best understood as "unlawful communication with a minor." By its plain terms, the statute prohibits the act of communicating with a minor for enumerated sexual purposes. The communication may take place in person, on the telephone, via a

computer, or in other ways.  Because the crime is complete as of the moment of communication, it is not necessary for the defendant to take any further affirmative steps to have physical contact with the minor, such as driving to a hotel.

*Commonwealth v. Rose*, 960 A.2d 149, 152–53 (Pa.Super.2008) (internal citations omitted).  The kind of "communication" contemplated by the statute encompasses non-verbal physical communication with the victim for the purposes of sexual contact.  *Leatherby*, 116 A.3d at 80.

Here, Fowler was convicted of two counts of unlawful contact with a minor.  The first count pertains to acts that occurred between 2011 and 2013 at the Hibernia Road residence.  *See* Commonwealth's Supplemental Response to Request for Bill of Particulars, 10/27/22, at 2 (unpaginated). Victim testified as to those incidents as follows:

Q:  Moving on to when you lived at Hibernia Road.  Were there ever any incidents there?

A:  Yes.

Q:  Tell me about that.

A:  Same instance, he was in charge of babysitting us.  We had wanted to—we had a pool back then, an above[-]ground pool.  We were not listening to him.  He wanted us to come inside and eat lunch.  And it was the same instance, you know, I didn't listen.  I was only six or seven.  I can't really remember.  And the same instance, he had gotten on top of me and had his penis in my vagina.

Q:  And are you able to say how many times that happened at Hibernia Road?

A:  Two that I can recall.

. . .

Q:  And do you remember anything about your clothing or his clothes during that incident?

A: Not that I can recall.

Q: How was he positioned in relation to you when that happened?

A: I was laying on the floor and he was over me[,] so his stomach was facing mine.

. . .

Q: And when you—you had said earlier that happened at least twice at Hibernia Road and you described one incident. Can you tell us about any other times at Hibernia Road?

A: The second incident that I can recall was the same thing as usual. We were being babysat by him because he was the oldest. Didn't listen. And I was in my room[,] actually[,] at that time. He had come in[to] my room—he had sent me to my room and had come in and did the same thing and put his penis in my vagina.

Q: And do you remember anything about your clothes from that incident?

A: Nothing I can recall.

Q: Do you know how your clothes were placed, on or off or something else?

A: My shirt was on. My pants were not.

Q: How did that come to happen?

A: He had taken off my pants and my underwear.

Q: And what was your positioning during that time?

A: I was to my back to my bed, so laying on my back.

. . .

Q: Are there any other incidents [at Gable Road or Hibernia Road] that you can remember?

A: Do you mean details of the incident or just in general?

Q: Just in general.

A: No.

Q: **During those incidents [at Gable Road and Hibernia Road] would he say anything to you, either before or while they were happening?**

A: **No.** Just the one time [at Gable Road] he had said that if I told anyone he would kill me.

N.T. Trial, 12/6/22, at 102-04, 106-07 (emphasis added).

The second charge stems from acts occurring between March 2013 and August 2013 at the Tulip Drive residence. *See* Commonwealth's Supplemental Response to Request for Bill of Particulars, 10/27/22, at 2 (unpaginated). Victim testified as follows:

Q: And then moving on to Tulip Road. Did anything happen at Tulip?

A: Yes, one time.

Q: What was that?

A: [] I think it was [when I was in] the fifth grade and I went to one of those winter social group get-together type things and I came back and my dad was upset with me that I didn't call to let him know when to pick me up. So[,] he was waiting for me outside for too long. And he was telling [Fowler] about it. And for some reason it got [Fowler] upset, as well. And when my dad had [gone] to an AA meeting at the time, [Fowler] came into my room and the same thing he had put his penis in my vagina.

N.T. Trial, 12/6/22, at 107.

Finally, Victim testified as follows with regard to a statement made to her by Fowler, without specifying the time or location at which the exchange occurred:

Q: Did [Fowler] ever say anything to you about that brother/sister relationship?

A: Yes.

Q: What did he say?

- 21 -

A:  One time when he was raping me[,] he said that this is what brothers and sisters do.

***Id.*** at 109.

Recently, in ***Commonwealth v. Strunk***, -- A.3d --, 2024 WL 4559099 (Pa. 2024), our Supreme Court granted allowance of appeal on the question of whether being "in contact with," as set forth in section 6328, includes conduct that is not communicative in nature.  There, the victim testified to two instances in which she feigned sleep while the defendant fondled her breast and eventually removed her pants and inserted his penis into her vagina.  During one of these incidents, the defendant whispered "something" into the victim's ear after he ejaculated, although she did not remember what he said.  The victim testified to a third incident in which the victim was lying on a couch recovering from oral surgery and was under the influence of painkillers.  Defendant fondled the victim's breast and digitally penetrated her vagina.  This time, she resisted, eventually causing him to leave her alone.  The victim testified that she was unsure whether defendant said anything to her prior to or during the assault.  Defendant was convicted of one count of unlawful contact with a minor.

On appeal, this Court concluded that the evidence was sufficient to support Strunk's conviction.  While the Court "acknowledged there was no evidence Strunk verbally communicated with the victim or gave nonverbal signals to achieve the sexual contact, it found the element of communication was satisfied by evidence that Strunk[, in removing or pulling down the victim's clothing in order to commit the assaults,] 'engaged in physical contact

with [the victim] beyond the assaults themselves to facilitate his sexual contact with [the victim.]'" ***Id.*** at *3.

On allowance of appeal, our Supreme Court began by reviewing prior decisions of this Court[12] addressing sufficiency challenges to convictions under section 6318, in which we "consistently confirmed that the statute is fundamentally concerned with communication." ***Id.*** at *6. Following a review of the textual history of section 6318, as well as dictionary definitions of the word "contact" and the idiom "come in contact with," the Court concluded that "the plain text does not resolve the issue of whether the legislature used 'contact' to refer solely to communication, or whether it intended to also use the alternative definition of a physical touching." ***Id.*** at *8. Thus, the Court turned to the legislative history of the statute, finding that

> the Superior Court has been consistently correct in recognizing the communicative focus of [s]ection 6318. Section 6318 does not criminalize inappropriate touching of minors; other statutes accomplish that goal. Section 6318 is perhaps best described as an anti-grooming statute. But even that description is imperfect. Any communication that is intended to further the commission of one of the crimes listed in [s]ection 6318(a), whether it fits the definition of grooming or not, falls within the prohibition.

***Id.*** at *11.

The Court ultimately determined that, in affirming Strunk's conviction for unlawful contact, this Court had

---

[12] Prior to ***Strunk***, the Supreme Court had never been called upon to interpret the substantive language of section 6318. ***See Strunk***, ***supra*** at *5 n.1. Prior cases involving that section were limited to sentencing issues. ***Id.***

conflated verbal, written, and other forms of non-verbal communicative efforts to mean any form of physical contact. That is not the purpose or intent of [s]ection 6318. Rather, [s]ection 6318 is intended to criminalize and punish communication designed to induce or otherwise further the sexual exploitation of children. As the record before us cannot establish that Strunk communicated with the victim to facilitate his assaults, his conviction for unlawful contact with a minor cannot stand.

*Id.* at *12.

Finally, the Court also rejected the Commonwealth's argument that the evidence was sufficient to support an inference that Strunk communicated with the victim in furtherance of the assaults under **Commonwealth v. Velez**, 51 A.3d 260 (Pa. Super. 2012). There, the victim's mother observed the victim's knees in the air with her pants removed as defendant was touching the victim's vagina. This Court concluded that it was reasonable to infer that the defendant had directed the victim to unclothe below the waist and assume that pose where "[t]he victim would not have had her pants removed and her legs in that position absent previous contact by appellant, either verbal or physical." *Id.* at 267. After noting that "the propriety of **Velez**'s explicit reasoning is beyond the scope of this appeal," **Strunk**, **supra** at *11, the **Strunk** Court distinguished that case on its facts, noting that in **Strunk**, the victim not only pretended to sleep during the time the defendant manipulated her clothing, but explicitly testified that he did not communicate with her while doing so. Thus, the Court concluded it would be "rank speculation for the jury to infer that Strunk communicated with the victim based solely on the fact that the assault occurred." *Id.*

- 24 -

In light of **Strunk**, we conclude that the Commonwealth failed to present evidence sufficient to support Fowler's convictions for unlawful contact with a minor. Specifically, as in **Strunk**, there was no evidence, other than the fact that the assaults occurred, that Fowler communicated with Victim, at either Hibernia Road or Tulip Drive, in furtherance of those assaults. Indeed, Victim testified that Fowler did not communicate with her in any way before or during the assaults. **See** N.T. Trial, 12/6/22, at 107 ("Q: During those incidents [at Gable Road and Hibernia Road] would he say anything to you, either before or while they were happening? A: No. Just the one time [at Gable Road] he had said that if I told anyone he would kill me."). The Commonwealth presented no evidence that Fowler, either verbally or non-verbally, directed Victim in any way either to remove her clothing or position her body in a particular manner prior to the assaults. **See Velez**, **supra** (evidence sufficient where facts supported inference that defendant directed victim, either verbally or non-verbally, to unclothe and lie on her back with her legs in the air). The sole incident in which Fowler could be said to have communicated with Victim in furtherance of an assault occurred when he told her "this is what brothers and sisters do." N.T. Trial, 12/6/22, at 109. However, Victim did not testify as to where or when Fowler made that statement. Thus, it would be "rank speculation," **see Strunk**, **supra** at *11, for the finder of fact to infer that Fowler communicated those words during either the Hibernia Road or Tulip Drive incidents, which formed the basis for his two charges of unlawful contact. Accordingly, we are constrained to vacate

Fowler's judgment of sentence with respect to his two convictions of unlawful contact with a minor.[13]

Finally, Fowler challenges the discretionary aspects of his sentence. Prior to addressing this claim, we must determine whether he has preserved it for appellate review. It is well-settled that "[t]he right to appeal a discretionary aspect of sentence is not absolute." *Commonwealth v. Dunphy*, 20 A.3d 1215, 1220 (Pa. Super. 2011). Rather, where an appellant raises such a challenge, an appellant's appeal should be considered as a petition for allowance of appeal. *See Commonwealth v. W.H.M.*, 932 A.2d 155, 162 (Pa. Super. 2007). An appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction by satisfying a four-part test:

> [W]e conduct a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. [720]; (3) whether appellant's brief has a fatal defect, [*see*] Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).

*Commonwealth v. Moury*, 992 A.2d 162, 170 (Pa. Super. 2010).

_____

[13] Because Fowler's convictions for unlawful contact merged for purposes of sentencing, the court imposed no further penalty on those counts. Accordingly, we need not remand for resentencing. *See Commonwealth v. James*, 297 A.3d 755, 770 (Pa. Super. 2023) (deeming remand unnecessary where vacated sentence was imposed concurrently and, therefore, did not disturb overall sentencing scheme).

Here, we are unable to address Fowler's claim, as he did not preserve it for our review by raising it before the trial court at sentencing or in a timely-filed post-sentence motion. "[A] written post-sentence motion shall be filed no later than 10 days after imposition of sentence." Pa.R.Crim.P. 720(A)(1). Here, the trial court imposed Fowler's sentence on March 31, 2023. Fowler did not file his post-sentence motion until 11 days later, on April 11, 2023; thus, it was untimely. Accordingly, this claim is waived. ***See Commonwealth v. Griffin***, 65 A.3d 932, 935 (Pa. Super. 2013) (objections to discretionary aspects of sentence generally waived if not raised at sentencing or preserved in post-sentence motion).

Convictions of unlawful contact with a minor vacated and defendant discharged as to those counts. Judgment of sentence affirmed. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 1/9/2025

- 27 -